STATE OF ALABAMA ex rel. Charles A. GRADDICK, as Attorney General of the State of Alabama, Plaintiff-Appellee,

v.

TENNESSEE VALLEY AUTHORITY et al., Defendants-Appellants.

No. 79–1283.

United States Court of Appeals, Fifth Circuit.

Feb. 13, 1981.

Rehearing Denied April 2, 1981.

---

Herbert S. Sanger, Gen. Counsel, Justin M. Schwamm, Sr., Asst. Gen. Counsel, Michael R. McElroy, Atty., Tenn. Valley Auth., Knoxville, Tenn., for defendants-appellants.

William B. Hubbard, Deputy Atty. Gen., William M. Leech, Jr., Atty. Gen., Nashville, Tenn., for State of Tenn., amicus curiae.

Edward E. Carnes, Asst. Atty. Gen., Montgomery, Ala., for plaintiff-appellee.

Before GEE, FAY and RANDALL, Circuit Judges.

GEE, Circuit Judge:

The Tennessee Valley Authority ("TVA" or "Authority") appeals from an order of the United States District Court for the Northern District of Alabama requiring that its "headquarters" in Knoxville, Tennessee, be packed up and moved to Muscle Shoals, Alabama. The district judge found this relocation necessary to bring TVA into compliance with section 8(a) of the Tennessee Valley Authority Act of 1933, 16 U.S.C. § 831g(a), which reads in pertinent part: "The corporation shall maintain its princi-

pal office in the immediate vicinity of Muscle Shoals, Alabama."[1]

Since its creation by act of Congress in 1933, the TVA has maintained offices in a number of locations, including Knoxville, Chattanooga, Muscle Shoals, and Washington, D.C., in order to facilitate performance of its statutory purposes. It is undisputed that the central administration of the corporation has been located from its earliest days in Knoxville. Members of the board of directors maintain their offices in Knoxville; most of their meetings are conducted there; the central offices and directors of a number of the corporation's major divisions are located there. A smaller office is maintained in Muscle Shoals; the administrative staffs of several divisions are located there. The TVA makes no pretense that these Alabama activities comprise those that would be carried on at the administrative headquarters of a corporation.

Dissatisfied with this arrangement, the State of Alabama filed suit in 1977[2] to force the TVA to relocate its central administration in Muscle Shoals. In lieu of an answer to this complaint, the TVA filed a motion for summary judgment.[3] Alabama filed a cross motion for summary judgment, which was granted by the court. In a January 25, 1979, order the judge enjoined the TVA "from locating or maintaining the headquarters of the Tennessee Valley Authority in any place other than in the immediate vicinity of Muscle Shoals, Alabama." It is from this order of the district court that TVA now appeals.

Two of the grounds for reversal urged by TVA need delay us only slightly, for we find that the court below correctly disposed of TVA's arguments on these points. That finding is slim comfort to appellee, for the judgment falls anyway on the third ground, discussed in detail below.

██ The Authority's assertions that Alabama lacked standing and that the state's claim was barred by the earlier decision in *Frahn v. TVA*, 41 F.Supp. 83 (N.D. Ala.1941), were sufficiently dealt with below. The amicus brief filed with this court by the State of Tennessee urging reversal is itself an eloquent evocation of Alabama's alleged injury in fact; the injury is certainly sufficient to insure that there exists the concrete adverseness of positions necessary to proper clarification of the issues. Alabama has standing to challenge the TVA's actions here. In *Frahn* a group of Alabama residents filed suit to remedy what they considered the TVA's intransigent refusal to obey the law. The district judge granted the Authority's Rule 12(b)(6) motion on the ground that these private individuals lacked standing to complain of TVA's behavior. The court additionally remarked that the determination of placement of its corporate headquarters was properly left to the TVA. The Authority's attempt to skewer Alabama on language in *Frahn*, even if this court were to find the substantive issue involved in this case there to have been resolved, must fail. Alabama was neither a party to the earlier lawsuit, nor is there an

---

**1.** The full text of the section runs: "The corporation shall maintain its principal office in the immediate vicinity of Muscle Shoals, Alabama. The corporation shall be held to be an inhabitant and resident of the Northern Judicial District of Alabama within the meaning of the laws of the United States relating to the venue of civil suits."

**2.** The TVA did not assert the equitable defense of laches to Alabama's suit for injunctive relief, and thus that affirmative defense is unavailable as a possible ground of decision here. Beyond noting the passage of 44 years between the establishment of the headquarters in Knoxville and the filing of this lawsuit, this court will not further consider that delay.

**3.** The TVA proposed several grounds for summary judgment in its motion, arguments raised again on appeal as grounds for reversal of the adverse trial court judgment: (1) that Alabama lacked standing to assert TVA's alleged noncompliance with the statutory provision on location of its "principal office"; (2) that *Frahn v. TVA*, 41 F.Supp. 83 (N.D.Ala.1941), an unsuccessful challenge to the Knoxville location earlier lodged by Alabama citizens, was *res judicata* of this challenge by the state; and (3) that the term "principal office" referred solely to a formal corporate office, denominated in the Act simply as a place for receipt of service of process, a location where the elusive corporate entity could always be found.

identity of interest with those individuals who were plaintiffs. In addition to its *parens patriae* interest, which arguably can be no different substantively from that of its citizens, the state asserts a proprietary interest distinct from that of any individual or group of its citizens.

■ Our findings that the district judge sufficiently resolved difficult questions of standing and *res judicata* can give Alabama only brief solace; fully entitled to bring this lawsuit, the state is not, however, entitled to prevail. The sole question for decision here, correctly recognized by the district court, is the meaning of the "principal office" provision of 16 U.S.C. § 831g(a). Summary judgment was thus the appropriate resolution of this matter; the victory simply went to the wrong contestant. This court must now consider the legal effect of the statutory requirement that the TVA maintain its "principal office in the immediate vicinity of Muscle Shoals, Alabama."

Contrary to Alabama's assertions, this court finds the "plain meaning" of the statutory language not to be all that plain. That application of a dictionary to the phrase necessarily results in the conclusion that certain (but not all) administrative functions of the Authority should properly exist only in Muscle Shoals is not ineluctably clear. As a legal term of art (if such it be), "principal office" lacks a certain definiteness in its connotation; courts and commentators confuse and differently distinguish phrases such as "principal office," "registered office," and "principal place of business." [4]

■ Confronted with a provision the reading of which we find ambiguous, this court must turn to familiar but nevertheless slippery tools of statutory construction. Before doing so, however, it is important to clarify what this exercise must entail. The TVA asserts that whatever the phrase actually means, the Authority's consistent forty-year reading of it is a reasonable one and that proper judicial deference to agency expertise would prompt this court to leave the reasonable interpretation undisturbed. That deferential solution would spare this court much of the following exercise and for that reason, among others, is a facially attractive one. That conclusion is, however, fundamentally flawed. The proposition the TVA here urges is appropriate in situations where the agency's challenged action in some way implicates its special expertise. *Cf. Young v. TVA*, 606 F.2d 143, 145 (6th Cir. 1979) (question of TVA authority to construct power plant outside watershed of Tennessee River; agency construction of statutory provision upheld in part because "[t]he construction and operation of power plants and the distribution of electric energy generated therefrom requires expertise which should be accorded deference by the courts"). This court is hard pressed to arrive at reasons why the TVA's interpretation of a purely legal point here should be accorded any weight at all, much less rendered the deference suggested. *Cf. Coca-Cola Co. v. Atchison, Topeka & Santa Fe Railway Co.*, 608 F.2d 213, 222 (5th Cir. 1979) ("[n]evertheless, even where the issue is one of pure law, such as interpretation of contracts, tariffs, regulations and statutes, room still is present for deference to the views of administrative agencies, *particularly where the understanding of the problem is enhanced by the agency's expert understanding of the industry*" (emphasis added)). Congress did not commit to the TVA's judgment the location of its principal office; that decision is chiseled in stone at 16 U.S.C. § 831g(a). If this court were to arrive at the legal determination that "principal office" meant administrative headquarters, then, absent congressional amendment of that provision,[5] the reasonableness

---

4. The comment to the revised Model Business Corporations Act indicates that confusion between the various terms typically used in state corporation laws prompted the drafters to settle on "registered office" as the favored term for the office named in the corporate charter as a place where the corporation could always be found.

5. A number of proposed amendments to § 8(a) have surfaced over the years, only to slip quietly back beneath the waves of congressional indifference. The most recent proposal was

of TVA's error could not save it from Muscle Shoals. The question is properly one for the court to decide, and so we turn to it. We conclude that TVA's interpretation of the "principal office" provision is not only reasonable, it is correct.

As suggested above, courts and commentators can be found falling on both sides of this definitional dispute; no attempt will here be made to cast these into respective measures and to determine the "weight" of authority. The sources that, however, helped lead us to our reading of the term in its context will be briefly noted and qualified.

The major corporate law treatises do not offer a united front. *Compare* 1 H. Oleck, *Modern Corporate Law* § 3, at 13 (1958) (" 'Principal office' means the place stated in the articles or certificate of incorporation as the address of the corporation."), *with* 8 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 4035, at 458 (1966) ("The words 'principal office' have a definite meaning, especially when applied to a corporation, in which case they mean the head office, the place where the principal officers generally transact business and the place to which reports are made and from which orders emanate."). The above formulations need not be mutually exclusive. A corporation's central headquarters, "from which orders emanate," could well be the office listed in the charter as the formal address of the entity. But it need not be; and as pointed out by the TVA, in common practice it frequently is not the same location. The Delaware corporation law statute for many years required businesses incorporating under its provisions to maintain a "principal office or place of business" within the state.[6] This popular incorporating state was never inundated with actual corporate headquarters because of this statutory requirement. No independent tabulation of now-outdated state corporation laws was

attempted by this court, but as computed by the TVA (and undisputed by Alabama), 27 states' statutes in that period required the listing of a "principal office" in corporate charters. Neither legislators nor certainly corporate officers considered the statute further to require the location of any particular corporate activity, administrative or otherwise, at that address.

In the pursuit of some insight into understandings of the elusive term "principal office," a survey of case law prior to and contemporary with the passage of the TVA Act produces mixed results. Much of the case law on the meaning of "principal office" is concerned with distinguishing it in the particular context from the "principal place of business" of the subject corporation. That exercise is not particularly helpful here, as the district court order does not require, nor does Alabama seek, the shifting of the majority of the dam construction, flood control, and electrical generating activities of the TVA to the "immediate vicinity of Muscle Shoals"; rather, the relocation of the administrative headquarters, which can be and often is distinct from the corporation's principal place of business, has been ordered.

■ When a word has a judicially settled meaning, it is presumed that Congress, by using that word in a statute, used it in that accepted sense. *United States v. Merriam*, 263 U.S. 179, 187, 44 S.Ct. 69, 71, 68 L.Ed. 240 (1923). The meanings here urged by the respective parties are not, however, judicially settled. In *Caceres v. United States Shipping Board Emergency Fleet Corp.*, 299 F. 968, 970 (E.D.N.Y.1924), the court distinguished "principal office" and "principal place of business" with the definition now immortalized in Fletcher's: "The words 'principal office' have a definite meaning, especially when applied to a corporation, in which case they mean the head office, the

apparently in direct response to the district court opinion in this case. *See* S. 757, 96th Cong., 1st Sess., 125 Cong.Rec.S. 3347 (1979), and H.R. 1595, 96th Cong., 1st Sess., 125 Cong. Rec.H. 339 (1979). This court has been made aware of no favorable action on this amend-

ment that perhaps would render the dispute moot.

6. The Delaware statute, following the suggestion of the revised MBCA, *see* note 4, *supra*, now speaks of a "registered office."

place where the principal officers generally transact business, and the place to which reports are made and from which orders emanate." Unsurprisingly, Alabama fastens on this and similar formulations as the correct judicial settlement of meaning. Dicta in a bankruptcy case decided by this court, however, offer support to TVA's position. In *Dryden v. Ranger Refining & Pipe Line Co.*, 280 F. 257 (5th Cir. 1922), the court had to determine the "principal place of business" of the bankrupt for jurisdictional purposes. Most of the corporate activity was centered in and around Ranger, Texas. The "general offices" of the company (described in the opinion as the administrative headquarters of the corporation) were in Kansas City, Missouri. Ranger Refining was a Delaware corporation with its "principal office in Wilmington, Delaware." *Id.* at 257–58. The case was found properly to belong in the Northern District of Texas, which included the town of Ranger, and not in the locations of either the general offices or the "principal office."

 The central question in statutory interpretation is, of course, what meaning *Congress* intended the term to bear when it passed the TVA Act. Neither party nor this court has uncovered any legislative history specifically on section 831g(a). This controversy that occupies us over forty years later merited no particular attention at the time of the Act's passage.

A consideration of the Act as a whole, however, supports our conclusion that the TVA is in full compliance with the statute by maintenance of an office in Muscle Shoals for receipt of service of process.[7]

 The TVA Act functions as the corporate charter of the Authority. 2A C. Sands, *Sutherland Statutory Construction* § 49.03, at 233 (4th ed. 1973), indicates that

the *practical* interpretation of a statute must be weighed in determining legislative intent. There is no reason to suppose that Congress intended so to confine the workings of the TVA.[8] The House committee that studied the TVA proposal reported: "We have sought to set up a legislative framework, but not to encase it in a legislative straightjacket. We intend that the corporation shall have much of the essential freedom and elasticity of a private business corporation." H.R.No.130, 73d Cong., 1st Sess. 19 (1933). The general thrust of the Act argues against a localization of its activities. The work of the TVA was expected to be broad and far ranging. The orientation was regional, even national, in scope, not limited to a single state or location. The argument of Alabama that use in the TVA Act of language identical to that of the principal office provisions of two earlier, presidentially vetoed Muscle Shoals corporation acts is unpersuasive. The expected work of the TVA was to range far beyond the existing operations at Muscle Shoals. As President Franklin Roosevelt stated in his message to Congress proposing passage of a Tennessee Valley Authority Act:

It is clear that the Muscle Shoals development is but a small part of the potential public usefulness of the entire Tennessee River. Such use, if envisioned in its entirety, transcends mere power development: it enters the wide fields of flood control, soil erosion, afforestation, elimination from agricultural use of marginal lands, and distribution and diversification of industry. In short, this power development of war days leads logically to national planning for a complete watershed involving many states and the future lives and welfare of millions. It touches

---

7. Other TVA business is conducted at Muscle Shoals, including that of the administrative offices and staffs of the divisions of agricultural development, chemical development, and chemical operations. Over 2,000 employees function there. But TVA does not argue that this activity satisfies Alabama's and the district court's reading of the statute; the activities at Muscle Shoals beyond the maintenance of the

"principal office" are not required by statute to be in any particular location.

8. Such confinement may well have been the intention of such Alabama representatives as Senators Lister and Hugo Black, as suggested in their subsequent statements; but the intentions, expressed or hidden, of any single representative do not create congressional intent.

and gives life to all forms of human concerns.

I, therefore, suggest to the Congress legislation to create a Tennessee Valley Authority—a corporation clothed with the power of government but possessed with the flexibility and initiative of a private enterprise. It should be charged with the broadest duty of planning for the proper use, conservation, and development of the natural resources of the Tennessee River drainage basin and its adjoining territory for the general social and economic welfare of the Nation.[9]

H.R.Doc.No.15, 73d Cong., 1st Sess. (1933).

In finding that the general thrust and outlook of the TVA Act militates against a reading that the principal office provision ordained anything more exacting than the maintenance of what, in more current terms, we refer to as a "registered office," this court must respond to a textual argument raised by Alabama that enjoys some surface appeal. Section 2(e) of the Act, 16 U.S.C. § 831a(e), provides in part: "Each member of the Board, in addition to his salary, shall be permitted to occupy as his residence one of the dwelling houses owned by the government in the vicinity of Muscle Shoals, Alabama, the same to be designated by the President of the United States." This salary supplement, Alabama argues, is senseless unless the members of the Board, and thus the administrative apparatus of the Authority, were to be living and working at the "principal office in Muscle Shoals." While Muscle Shoals is undoubtedly a lovely area, nothing in the record indicates that it is particularly suitable for vacation homes.

The free-residence provision is couched in permissive terms; the initial House version of the Act (sponsored by Lister Hill of Alabama) read: "All members of the Board shall reside in the vicinity of Muscle Shoals." The adoption by the full Congress of the permissive language in the Senate version was seen by the Joint Congressional Committee on the Investigation of the Tennessee Valley Authority in this manner: "Thus Congress provided for the possibility that the Authority might locate its administrative headquarters at Muscle Shoals, but refrained from requiring that it do so." [10] S.Doc.No.56, 75th Cong., 3d Sess. 22 (1939). At the passage of the Act, the only readily identifiable property to be immediately transferred to TVA control was at Muscle Shoals. Congress undoubtedly contemplated significant activity there, perhaps even assumed the location of headquarters there. But as this court has written, "[a]n assumption is not a law." *Rogers v. Frito Lay, Inc.*, 611 F.2d 1074, 1082 (5th Cir. 1980). This provision is not a sufficient indication that Congress, by fixing the location of the TVA's principal office and allowing the directors free housing there, required the establishment of the corporate headquarters at that same location.

While there exists a paucity of congressional discussion of this provision at the time of the Act's passage, arguments to this court of both parties are replete with after-the-fact commentary by congressmen and committee. The majority report of the above-mentioned joint congressional committee found in answer to the specific question of TVA's alleged noncompliance with section 831g(a) that "[t]he committee finds that the Authority has legally complied with that part of subsection (a) of section 8

9. The President's interpretation of the principal office provision coincided with that of the TVA—an unsurprising development since, as even the Tennessee Valley Authority admits, it was drafted by the TVA. President Roosevelt responded to Sen. Black's immediate complaints that the TVA was not complying with the principal office provision by letter of September 6, 1934, that read in pertinent part: "It therefore seems to me to be clear that the Congress meant by the provision as to the location of the principal office of the Authority

only to fix a legal domicile—not to restrict or localize its business operations in any way."

10. It can be argued, however, that all that was permissively granted was the right to live in a government residence as opposed to some other residence accessible to the principal office in Muscle Shoals; that is, while directors could live where they wished, their working location remained at the principal office (in the immediate vicinity of Muscle Shoals).

**1068**

of the act, as amended, which requires that the principal office of the Authority be maintained in the immediate vicinity of Muscle Shoals, Ala." S.Doc.No.56, 75th Cong., 3d Sess. 9 (1939). In arriving at this conclusion, the committee majority reported: "The term 'principal office' has a definite legal meaning, as a fixed location where the corporation may always be served with legal papers. It is not synonymous with operating or administrative headquarters, which are often located in an entirely different jurisdiction." S.Doc. No.56, 75th Cong., 3d Sess. 21 (1939). The majority report recommended "that Congress give immediate consideration to clarifying the question about which substantial difference of opinion has existed." S.Doc. No.56, 75th Cong., 3d Sess. 22 (1939). This invitation to full congressional attention has been met only by silence.

For its part, Alabama advances the vigorously dissenting minority report of the joint committee, the testimony before that committee of Alabama Senators Bankhead and Hill and Representative Sparkman, and the immediate objections voiced by Senator Black in letters to Chairman Morgan of the TVA and President Roosevelt. The gist of these statements was that the maintenance of the actual administrative headquarters of the TVA in Knoxville rather than Muscle Shoals was "a plain, palpable and open violation of the statute."[11] Neither party's arguments from subsequent statements are particularly helpful in divining the congressional intent. This court disposed of similar arguments in *Rogers v. Frito Lay, Inc.,* supra, with this observation:

> The retroactive wisdom provided by the subsequent speech of a member of Congress stating that yesterday we meant something that we did not say is an ephemeral guide to history.... What happened after a statute was enacted may be history and it may come from

members of the Congress, but it is not part of the legislative history of the original enactment.

611 F.2d at 1080. With particular relevance to the 1939 report of the joint congressional committee, the *Rogers* court wrote:

> Had this statement [of a subsequent committee] been made in the report of the committee that recommended the legislation, it would indeed be part of the statutory history. When uttered five years later [in this case, six years], it is mere commentary. Moreover, a committee is not the Congress. It cannot create a congressional intent that did not exist, or amend a statute by a report.

*Id.* at 1082.

■ The Supreme Court, however, reminds us that such subsequent expressions are not without their usefulness. "And while the views of subsequent Congresses cannot override the unmistakable intent of the enacting one, ... such views are entitled to significant weight ... and particularly so when the precise intent of the enacting Congress is obscure." *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980). The "precise intent of the enacting Congress" is here certainly "obscure," but it is doubtful that the statements offered here can be said to approach anything so grand as the view of a subsequent Congress. Strong statements fully supportive of their respective positions are offered by each party. But the only thing approaching a "view of Congress" is its silence in the face of this controversy. The chief force of these subsequent declarations, then, lies in their indication of congressional awareness, at a very early date, of the TVA's alleged noncompliance with the statutory provision. The silence of Congress did not result from ignorance of the dispute. Congress was directed to the problem; simply no action was taken.[12] Congressional inaction is, of

**11.** Letter of Senator Black to A. E. Morgan, July 11, 1934.

**12.** Alabama attempts to draw significance from the failure of passage of two bills introduced by Tennessee representatives to amend § 831g(a)

by substituting Knoxville for Muscle Shoals as the location of TVA's principal office. The Supreme Court has remarked that "unsuccessful attempts at legislation are not the best of guides to legislative intent." *Red Lion Broad-*

course, a jumbled text from which to extract much meaning. But continued congressional funding of allegedly improper agency action can be viewed in appropriate circumstances as a ratification of that agency practice. *Young v. TVA*, 606 F.2d 143, 147 (6th Cir. 1979); *Swan Lake Hunting Club v. United States*, 381 F.2d 238, 241 n.3 (5th Cir. 1967).[13] Aware of the challenge to TVA's construction of the principal office provision, Congress continues, as it has since 1934, to appropriate funds for the maintenance of the central headquarters in Knoxville, not Muscle Shoals. During a period in which the TVA directors, in the exercise of their business judgment, felt that efficiency (and not the terms of section 831g(a)) dictated a removal of the administrative headquarters *to* Muscle Shoals, congressional riders restricted the use of appropriated funds in aid of that move. And while the Act has been amended several times over the ensuing years,[14] Congress has expressed no dissatisfaction with the Authority's construction of the principal office provision.

To be sure, it may not always be realistic to infer approval of a judicial or administrative interpretation from congressional silence alone. [citations omitted] But once an agency's statutory construction has been "fully brought to the attention of the public and the Congress," and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.

*United States v. Rutherford*, 442 U.S. 544, 554 n.10, 99 S.Ct. 2470, 2476 n.10, 61 L.Ed.2d 68 (1979).

A lengthy consideration of the ambiguous meaning of the statutory term, general principles of corporate practice, the broad and flexible powers and purposes conferred by the statute, and the echoing silence of Congress in the face of the controversy leads this court to conclude that the district court's judgment must be reversed and this case remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

casting Co. v. FCC, 395 U.S. 867, 381 n.11, 89 S.Ct. 1794, 1802 n.11, 23 L.Ed.2d 371 (1969).

13. *TVA v. Hill*, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), suggests a wary application of such principles of implied statutory alteration. This situation is not that of *Hill*; there are here no competing statutory policies, no confusion about purposes or goals. The argu-

ment is not one of repeal by implication, the disfavor of which *Hill* ably expresses. *See Young v. TVA*, 606 F.2d at 148.

14. Including an amendment in 1935 making explicit the intention that the Act "be liberally construed to carry out the purposes of Congress." 16 U.S.C.A § 831dd.