**Diane DRYSDALE, et al., Plaintiffs, Appellees,**

v.

**Thomas SPIRITO, Defendant, Appellant.**

**No. 82–1218.**

United States Court of Appeals, First Circuit.

Argued May 7, 1982.

Decided Sept. 14, 1982.

Scott A. Smith, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., Boston, Mass., was on brief, for appellant.

Mary C. Gallagher, Boston, Mass., with whom T. Richard McIntosh, Hyannis, Mass., was on brief, for appellees.

Before CAMPBELL, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

Plaintiffs, appellees in this case, are a class of dependent children who receive welfare payments under the Aid to Families with Dependent Children (AFDC) program. Social Security Act §§ 401–410, 42 U.S.C. §§ 601–610. Each plaintiff has a "caretaker parent" (often, but not always, the plaintiff's mother) who is not herself in need of welfare and who also has some earned income. Because the caretaker parent is not needy, each plaintiff is a victim of what he believes is an anomaly in the way the amount of his AFDC grant is calculated: If his caretaker parent were herself needy, a certain portion of her earned income would be disregarded in calculating the size of the AFDC grant. But, because the plaintiff's caretaker parent is not herself needy, this portion is not disregarded. The effect is to reduce the size of the AFDC grant. Plaintiffs have sued Thomas Spirito, Commissioner of the Massachusetts Department of Welfare—claiming that this anomaly violates the Social Security Act. The district court agreed. We believe, however, that federal law permits the Department not to apply the "earned income disregard" to plaintiffs' caretaker parents. We therefore reverse the district court's decision.

## I

At the outset, it is important to understand some of the rudiments of how the AFDC program works in Massachusetts. AFDC is a joint federal-state program. Its purpose is to provide support for needy dependent children (lacking the support of at least one parent) and for certain others living with them. The federal government participates in the program financially according to a complex formula set out in 42 U.S.C. § 603; the state provides both funding and administrative support. If a state chooses to participate in the AFDC program, it must conform to the specific requirements of the Social Security Act, *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), in part set out in the thirty-three subsections of 42 U.S.C. § 602.

In principle, the operation of the Massachusetts program is simple. The Department determines whether a group of persons within a household is eligible for assistance by comparing their income (and assets) with a dollar standard of need. If they are "in need," the Department sends them a check equal to the difference between the standard of need and their income. In practice, however, these determinations are complicated, for they are made in accordance with a series of highly detailed statutes and regulations. We consider here several such complexities.

A. *Eligibility and income.* Insofar as is relevant here, the Department first looks to see whether the dependent children in a household are in need. To do so it looks at *their* assets and income. Of course, most children have no assets and income of their own; but the federal regulations require the Department to deem the income of the child's parents (if living with the child) to be income available to the child. 45 C.F.R. § 233.30(a)(3)(vi)(b). This fact ordinarily means that if the children qualify for AFDC, the caretaker parent will also qualify. Assume, for example, that there are two dependent children living with their single mother in a Massachusetts home; the children are without income of their own and the mother has a small income. Either the mother's monthly income is below the Massachusetts standard of need for a group of three persons (about $380) or it is not. If it is, Massachusetts sends a check aimed at raising the three-person unit's income to that level; if not, no one receives a check. Thus, ordinarily, as practical matter, it makes little difference whether one considers the check as sent to three individuals,

to a three-person "family," or (as Massachusetts calls it) to a three-person "assistance unit."

As the word "ordinarily" suggests, however, there are many cases that are not ordinary. And, we must here consider two complications that can arise in picking out persons eligible for AFDC assistance. First, there may be another person living in the household whose presence there is helpful to the child and who is needy, but who does not qualify for AFDC assistance directly. Consider, for example, a needy stepfather or the spouse of the "caretaker relative" (there can be only one caretaker), whose presence in the house is highly desirable. These people are called "essential persons," and the Department may take their needs into account when determining total "need" and when writing the assistance check. See 106 C.M.R. § 304.310. If so (even though, technically speaking, the money is being given to the child "for the essential person") the "essential person" in Massachusetts terminology would be considered part of the "assistance unit."

Second, it is possible, though unusual, for a caretaker relative not to be "needy" (and thus to be outside the "assistance unit") even though the children are "needy" (and thus alone comprise the unit). This can happen if the caretaker relative has income that is not "deemed" part of the children's income for eligibility purposes. At the time this case was brought, there were at least two such circumstances. A single, divorced, or widowed mother might marry a person who became the children's stepfather. The income of her new husband would then be deemed to be her income. But, in light of a series of court cases interpreting the Social Security Act, the Department was not allowed to consider the stepfather's income as the dependent child's income.[1] See *Solman v. Shapiro,* 300 F.Supp. 409, 415–16 (D.Conn.) (three-judge court), *aff'd,* 396 U.S. 5, 90 S.Ct. 25, 24 L.Ed.2d 5 (1969). See *also Van Lare v. Hurley,* 421 U.S. 338, 95

S.Ct. 1741, 44 L.Ed.2d 208 (1975); *Lewis v. Martin,* 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); *King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). Or a mother under eighteen might still be living with her parents. Her parents' income would be considered to be her income, for the parents have a legal obligation to support her. Her parents' income, however, would not be considered to be her children's income, for her parents have no legal obligation to support their grandchildren. In either of these cases, the mother would still be considered to be the "caretaker relative," but, if the income deemed to her is sufficient to provide for her own needs, she would not be considered to be "needy." Only the children would be needy; the "assistance unit" would consist of them, not them plus her; and the check that she continued to receive in her role as the caretaker relative would be solely for use to meet the needs of the children. This case involves such nonneedy caretaker parents.

B. *The Earned Income Disregard.* We turn now to a second set of relevant complications, arising when the Department calculates the amount of the check that the needy persons are to receive. These complications flow from Congress's recognition that the AFDC system can create a financial incentive not to work—a recognition that led Congress to provide an earned income disregard (EID). The EID, added to the federal statute in 1968, and codified in 42 U.S.C. § 602(a)(8), reflected Congress's awareness that, because increased income reduces the size of the AFDC grant, members of AFDC families may have little financial incentive to work. If, for example, every dollar earned is considered a dollar of income that reduces the AFDC grant, then if a Massachusetts mother with two dependent children earns $380 (the "need level"), her assistance unit would receive no payment. If she stops working (and has no other income), the assistance unit would

---

1. The Omnibus Budget and Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 842, added a new subsection to § 602. This subsection, (a)(32), now allows stepparent deeming. There are certain broad exclusions peculiar to deemed stepparent income, but those same exclusions apply to the income as deemed to the spouse and as deemed to the stepchild.

still receive about $380, but it would take the form of an AFDC payment instead of a paycheck.

To counteract this perverse incentive, Congress provided that dependent children who remain in school may keep all of their earned income. When the Department calculates their AFDC grant, it must disregard 100 percent of their earned income. 42 U.S.C. § 602(a)(8)(A)(i) (1968 enactment); 42 U.S.C. § 602(a)(8)(A)(i) (after 1981 amendments). Congress went on to state, in a provision more relevant here, that persons who are "dependent child[ren] not included under [clause (a)(i), referred to directly above], a relative receiving such aid, and any other individual (living in the same home as such relative and child) whose needs are taken into account" in making the determination of need, shall have the first $30 and one-third of the remainder disregarded from their earned income. 42 U.S.C. § 602(a)(8)(A)(ii) (1968 enactment).

Congress sought to tailor the EID to act solely as an incentive for persons receiving AFDC to earn income and so remove themselves and their families from the AFDC rolls, not as an incentive for people not receiving AFDC to apply for AFDC. It therefore limited the EID by prohibiting the state from applying the EID to "any of such persons specified in clause (ii) of subparagraph (A) if with respect to such month the income of the persons so specified (within the meaning of clause (7)) was in excess of their need as determined by the State agency pursuant to clause (7) (without regard to clause (8)), unless, for any one of the four months preceding such month, the needs of such persons were met by the furnishing of aid under the plan. . . ." 42 U.S.C. § 602(a)(8)(D) (1968 enactment). In simple terms, this clause requires a recipient first to qualify for AFDC on the basis of total income (not subtracting the EID). Then, the Department will apply the EID to determine the amount of the grant. Congress's object was to prevent use of the EID to increase the *number* of persons receiving welfare.[2]

The result was a compromise carrying with it a certain amount of unfairness. Take our example of the mother with two dependent children. Simplifying considerably, if this mother earned $375 per month (slightly less than the standard of need for the assistance unit) the assistance unit would be eligible for AFDC; and the Department would use the EID in calculating the amount of its AFDC grant. The Department would therefore count the assistance unit's income as $230 (subtracting $30 plus one-third of the remainder); it would give the unit an AFDC grant of $150; and this would leave the unit with a total income of $525. An identical family with an earned income of $381 (slightly more than the standard of need) would not qualify for AFDC, thus maintaining a total monthly income of $381—$144 less. Congress understood this unfairness and explicitly referred to it. However, it considered the alternatives—expanding the welfare rolls or not providing a work incentive—to be still worse. S.Rep.No.744, 90th Cong., 1st Sess., *reprinted in* 1967 U.S.Code Cong. & Admin. News 2834, 2995, 2996.

With this background in mind, we can now turn to the particular claims of the plaintiffs in this case. Plaintiffs are children whose caretaker parents are not needy. This situation arises because some, but not all, of the parents' income is deemed available to them. Plaintiffs do not question this deeming of income. Nor do they question the determination that their parents are not needy. They object only to the way the Department calculates the amount of their parents' income deemed available to them. In particular, they claim that the Department ought to apply the EID to that income when determining the amount of the grant which the plaintiffs are entitled to receive. They argue that the Department is required to apply the EID to their caretaker parents' income. The Department disagrees.

---

**2.** The Omnibus Budget and Reconciliation Act of 1981, *see* note 1 *supra,* also altered the test for determining family eligibility. *See* 42 U.S.C. § 602(a)(18) (1982).

After considering memoranda and arguments, the district court accepted plaintiffs' argument. It concluded that plaintiffs' caretaker parents were "relatives receiving aid" within the meaning of § 402 (a)(8)(A)(ii), 42 U.S.C. § 602(a)(8)(A) (ii) (1968 enactment). It further concluded that nonneedy caretakers were not excluded by § 402(a)(8)(D), 42 U.S.C. § 602(a)(8)(D) (1968 enactment). Its decision is consistent with the interpretations of the other courts which have considered this question. *Percey v. Blum,* 524 F.Supp. 324 (N.D.N.Y.1981); *Anderson v. Blum,* 77 A.D.2d 386, 434 N.Y.S.2d 778 (App.Div.1980); *Cirrana v. D'Elia,* 96 Misc.2d 994, 410 N.Y.S.2d 235 (Sup.Ct.1978), *aff'd on the basis of the opinion below,* 70 A.D.2d 591, 415 N.Y.S.2d 1014 (App.Div. 1979).

In August 1981 Congress passed the Omnibus Budget and Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 842, which restructured both 42 U.S.C. §§ 602(a)(7) and 602(a)(8), repositioning the two sections that are key in this case, and making some changes in language. The district court apparently concluded that these changes did not alter its interpretation of the Act. Therefore, in February 1982 the district court entered final judgment in favor of the plaintiffs.

The Commissioner appeals from the judgment of the district court, claiming that the court misinterpreted the relevant statutes. We agree with the Commissioner that the district court misinterpreted the 1968 Act and that the 1981 Act does not require a different result. Because of our decision on the merits of this case, we do not reach the Department's further claims that the relief granted by the district court encroached upon the Commonwealth's Eleventh Amendment rights to sovereign immunity.

## II

The legal issue before us is one of statutory construction. We seek to ascertain the intent of the Congress that enacted the EID provision. *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 596, 100 S.Ct. 800, 813, 63 L.Ed.2d 36 (1980); *United States v. Merriam,* 263 U.S. 179, 187, 44 S.Ct. 69, 71, 68 L.Ed. 240 (1923); *Alabama v. TVA,* 636 F.2d 1061, 1065 (5th Cir. 1981). Plaintiffs argue that Congress intended to include their caretaker parents within the scope of the EID because the EID's rationale applies to "nonneedy" as well as "needy" caretakers. If the needy mother won't work when she finds her larger paycheck offset by a smaller welfare check, why will a "nonneedy" mother behave differently? Even if the work incentives differ enough to allow Congress, from a constitutional perspective, to provide different treatment, Congress did not explicitly consider the nonneedy caretaker.[3] Thus, given the similarity of purpose, and the legislative history's silence, should we not read the statute as including the nonneedy, as well as the needy caretaker?

In determining the intent of Congress, however, we must begin with the language of the statute. It is that language which tells us, not what Congress ought to have done, but what it did do. *See Flora v. United States,* 357 U.S. 63, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958); *United States v. New England Coal & Coke Co.,* 318 F.2d 138, 142 (1st Cir. 1963). *See also United States v. Ray,* 488 F.2d 15, 18 (10th Cir. 1973). *Cf. Greenwood v. United States,* 350 U.S. 366, 374, 76 S.Ct. 410, 414, 100 L.Ed. 412 (1956). "Absent a clear indication of legislative intent to the contrary, the statutory language controls its construction." *Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158 n.3, 101 S.Ct. 2239, 2241 n.3, 68 L.Ed.2d 744 (1981) (*per curiam*).

In this instance, we consider a highly technical statute, using words and phrases that have acquired a technical and specific meaning in the welfare field over the course of many years. Viewing the EID language through the lenses of history and

---

**3.** Plaintiffs raised an Equal Protection claim in their complaint, but they neither argued that claim to the district court in their motion for summary judgment, nor argued it to this court. We therefore deal only with the statutory claim.

usage, we find it difficult to fit plaintiffs' parents within this scope.

The specific statute directs the state agency to apply the EID to three sorts of earned income:

1) The "earned income of a dependent child . . . receiving [AFDC],"

2) The "earned income of . . . a relative receiving such aid,"

3) The "earned income of . . . any other individual (living in the same home as such relative and child) whose needs are taken into account in making . . . [the] determination [of need]."

42 U.S.C. 602(a)(8)(A)(ii) (1968 and 1981). The income here at issue does not fit the first category because it is not the "*earned*" income of the child; although it is deemed "income" of the child, it is *earned* by the parent. Plaintiffs argue, however, that the income fits within the second category because Congress meant to include the nonneedy caretaker parent within the term "relative receiving aid." Alternatively, they argue that the income fits within the third category because the caretaker parent is an "other individual . . . whose needs are taken into account." We deal with these two claims in turn.

1. Plaintiffs' claim that their nonneedy caretaker parents are "relatives receiving aid" focuses on the word "receive." Although they concede that nonneedy caretaker parents do not receive aid on their own behalf, they point out that their children's AFDC checks are sent to the caretaker parent. Because the word "receive," standing alone, means only "to get," without a limitation on use, they claim that the nonneedy caretaker—the payee for her children's check—"receives aid" within the plain meaning of (8)(A)(ii). The Department responds that the phrase "relative receiving aid" applies only to a caretaker relative who receives aid on her own behalf.

The history of the provision at issue within the context of the Social Security Act provides strong support for the Department's position. It suggests that the phrase "relative receiving aid" has a dis-

tinct meaning within the context of the Act; that it must be viewed as a phrase; and that it is not susceptible to plaintiffs' word-by-word interpretation.

"Aid to Dependent Children" was one of four categorical assistance programs enacted in 1935. Social Security Act of 1935, Title IV–A, Pub.L. No. 74–271, 49 Stat. 627. As the original name of the program suggests, Aid to Dependent Children provided for benefits on behalf of needy children only; there was nothing in the grant to cover the needs of any other persons in the household. The dependent child was, however, always defined in relation to a particular relative with whom the child lived; in AFDC jargon, this particular person is the "caretaker relative." Thus, as originally enacted in 1935, §§ 406(a) and (b) defined the scope of the Act:

(a) The term 'dependent child' means a needy child under the age of sixteen who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepsister, uncle, or aunt, in a place of residence maintained by one or more of such relatives as his or their home.

(b) The term 'aid to dependent children' means money payments with respect to a dependent child or dependent children.

42 U.S.C. § 606(a) and (b), *as enacted by* Pub.L. No. 74–271, § 406, 49 Stat. 629 (1935). This caretaker relative, from the inception of the AFDC program, acted as payee for the child's aid; checks were not sent directly to minors.

In 1939 Congress added the income and resources clause of § 402(a)(7) to the Act, in order "to assure that 'no Little Orphan Annie will receive public assistance if she has a Daddy Warbucks.'" *National Welfare Rights Organization v. Mathews,* 533 F.2d 637, 642 (D.C.Cir.1976) (quoting *Arizona State Department of Public Welfare v. Department of Health, Education and Welfare,* 449 F.2d 456, 469 n.19 (9th Cir. 1971),

*cert. denied,* 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972)). Reflecting the limited availability of benefits *to meet one's own needs,* subsection (a)(7) at that time required state plans to

> provide that the State agency shall, in determining need, take into consideration any other income and resources of any child claiming aid to dependent children
> . . . .

42 U.S.C. § 602(a)(7), *as amended by* Social Security Act Amendments of 1939, Pub.L. No. 76–379, § 403, 53 Stat. 1379–80.

In 1950 Congress for the first time made specific provision for the need of the caretaker relative. This change was brought about by amending § 606(b) and adding a new § 606(c). That section then redefined the scope of Aid to Dependent Children as follows:

> (b) The term 'aid to dependent children' means money payments with respect to, or medical care on behalf of or any type of remedial care recognized under State law in behalf of, a dependent child or dependent children, and . . . includes money payments or medical care or any type of remedial care recognized under State law for any month to meet the needs of the relative with whom one dependent child is living if money payments have been made under the State plan with respect to such child for such month.
>
> (c) The term 'relative with whom any dependent child is living' means the individual who is one of the relatives specified in subsection (a) and with whom such child is living within the meaning of such subsection in a place of residence maintained by such individual (himself or together with any one or more of the other relatives so specified) as his (or their) own home.

42 U.S.C. § 606(b) and (c), *as amended by* Social Security Act Amendments of 1950, Pub.L. No. 81–734, § 323(a), 64 Stat. 551. The terms of this section make clear that aid may be extended to a single relative only, that is, the caretaker relative.

In 1962 Congress changed the language of the income and resources clause of § 602(a)(7), introducing for the first time the phrase "relative claiming aid." The reworded subsection required the state plan to

> provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, as well as any expenses reasonably attributable to the earning of such income.

42 U.S.C. § 602(a)(7), *as amended by* Public Welfare Amendments of 1962, Pub.L. No. 87–543, § 104(a)(3)(A), 76 Stat. 185. The addition of the words "or relative" and the changing of the name of the program from "aid to dependent children" to "aid to families with dependent children" were technical changes made to conform § 602(a)(7) to § 606(b). The Senate Report stated:

> In line with the new emphasis on family services, the bill would provide that the name of the program be changed to "Aid and Services to Needy Families with Children," and that the name of the assistance provided under that program be changed to "Aid to Families With Dependent Children."

S.Rep.No.1589, 87th Cong., 2d Sess., *reprinted in* 1962 U.S.Code Cong. & Admin.News 1943, 1956. *See also* S.Rep.No.165, 87th Cong., 1st Sess., *reprinted in* 1961 U.S.Code Cong. & Admin.News 1716, 1723. Interestingly enough, in the same series of amendments, Congress did refer to the caretaker relative specifically in her role as the payee for her children's benefits. Concerned that the monies intended to benefit the child might be misappropriated, Congress introduced sanctions against the "relative receiving such *payments*" (not "such *aid*") if she did not use them in the best interests of the child. 42 U.S.C. § 605, *as amended by* Public Welfare Amendments of 1962, Pub.L. No. 87–543, § 107(a), 77 Stat. 188–89.

■ It follows from this history of the development of the AFDC program that "a relative claiming aid" as that phrase is used in subsection (a)(7) refers to a caretaker

relative claiming aid to meet her own needs, not merely seeking benefits to meet the needs of her children. Had the receipt of the "payment," *cf.* § 605, been sufficient to convert a nonneedy caretaker into a "relative claiming aid," one might have expected subsection (a)(7) to have included reference to the relative from its inception in 1939. Moreover, had the 1962 change been intended to bring the nonneedy caretaker within the scope of subsection (a)(7), it would have been described as an attempt to rectify an omission dating from 1939, not an attempt to bring that section into conformity with the expanded availability of benefits to cover the needs of the caretaker. There is no evidence that the 1962 amendment of subsection (a)(7) was intended to reach beyond the scope of § 606—the section defining the benefits received by persons on their own behalf. Indeed, subsection (a)(7) is commonly defined by reference to § 606. *Dandridge v. Williams,* 397 U.S. at 510, 90 S.Ct. at 1174 (Marshall, J., dissenting); *id.* at 498, 90 S.Ct. at 1168 (Douglas, J., dissenting); *Solman v. Shapiro,* 300 F.Supp. at 414 & n.6.

It is unlikely that the words "relative receiving aid" as used in subsection (a)(8)(A)(ii) refer to a person who is not a "relative claiming aid" under subsection (a)(7). The language of subsection (a)(8)(A)(ii), by and large, tracks the language of subsection (a)(7); indeed the subsections refer to one another. There is no indication in the language of the statute or in the legislative history suggesting more than an intent to echo subsection (a)(7), applying the EID to the income of any of the persons specified in that subsection.

The district court suggested that to read "relative receiving aid" in subsection (a)(8) as tracking "relative claiming aid" in subsection (a)(7) results in an inconsistency. But it was wrong. The district court correctly noted that the income possessed by the nonneedy caretaker was counted in determining the amount of the AFDC grant to the dependent children. The court incorrectly concluded from this fact that the nonneedy caretaker must be one of the persons specified in subsection (a)(7), in particular, the "relative claiming aid." As noted in the explanation of deeming above, however, the income possessed by the nonneedy caretaker parent is counted under subsection (a)(7), not because the nonneedy caretaker is a "relative claiming aid," but because the income is deemed that of the dependent child—*i.e.,* it is considered the income of a "child ... claiming aid" under subsection (a)(7).

There is nothing in the history of the Act to suggest that either subsection (a)(7)'s "relative claiming aid" or (a)(8)'s "relative receiving aid" includes a nonneedy relative receiving aid on behalf of others. And there is considerable history suggesting that to "receive" aid means to obtain benefits for one's own needs. In fact, if caretaker parents who serve as a conduit for payments intended solely for the aid of their children "receive" aid, then presumably so would third party representative payees, appointed under § 406(b), 42 U.S.C. § 606(b), and representative payees appointed pursuant to 42 U.S.C. § 1383(a)(2) would be recipients of benefits under Supplemental Security Income (SSI). Yet, there is no indication Congress wished to include such technical recipients (who might also be relatives) as among those who "receive" aid within the meaning of the statute.

Reference to other sections of the Social Security Act supports the concept that to "receive aid" means to receive benefits to cover one's own needs. Thus, § 403, 42 U.S.C. § 603, contains a complex formula for the computation of federal financial participation. That formula bases federal participation in part upon the number of "recipients" within a state; the obvious reference is to persons on whose behalf the state expends money. Similarly, Subchapter XIX (Grants to States for Medical Assistance Programs) (Medicaid) requires a state plan under that subchapter to provide for "making medical assistance available ... to all individuals receiving aid and assistance under any plan of the State approved under subchapter ... XVI of this chapter [SSI] or part A ... of subchapter

IV of this chapter [AFDC]...." 42 U.S.C. § 1396a(a)(10)(A). If the plain meaning of "receive aid" includes within its terms persons who receive checks containing aid payments, not for themselves, but for other persons for whom they are responsible, then § 1396a(a)(10)(A) would require nonneedy caretaker relatives to be automatically eligible for Medicaid. *Cf. Ciampa v. Secretary of Health and Human Services,* 687 F.2d 518 (1st Cir. 1982). The words would also make other representative payees under AFDC or SSI automatically eligible for Medicaid. These results, flowing from plaintiffs' interpretation of the word "receive," strongly suggests that that is not what Congress meant.

2. Similarly, an examination of the Social Security background and context militates against plaintiffs' alternative claim—that the nonneedy caretaker parent is an "other individual (living in the same home as such relative and child) whose needs are taken into account in making [the need] determination" under subsection (a)(8)(A)(ii). Plaintiffs' statutory argument with regard to this phrase proceeds word-by-word, divorces the phrase from its historical meaning, and strains the natural meaning of the words used. Plaintiffs admit that Massachusetts does not include the needs of their caretaker parents in the AFDC grant; nevertheless they argue that every time the Department determines that a caretaker is not in need, it must necessarily take the needs of the caretaker "into account" in the very process of determining that she is not in need.

The history of the inclusion of the "other individual ... whose needs are taken into account in making [the need] determination" makes clear, however, that that phrase, too, must be read as a phrase with a particular historical meaning. The "other individual" language was added to both subsection (a)(7) and to § 606(b) in 1968; this addition reflected an expansion of the group of persons for whose needs the state would spend money. The "other individual" is known in Social Security jargon as an "essential person," explained by the court in *Solman v. Shapiro,* 300 F.Supp. at 414:

A state's plan may provide for certain special needs, not necessary for all individuals. Section 602(a)(7) recognizes the validity of such a type of special need. It takes into account cases where it is found desirable to provide a qualified recipient of assistance with something more than what is necessary for mere physical subsistence. An example would be a case of a child whose mother works and there is also another child in the family above the age for eligibility for aid to dependent children. However, the state may consider that the continued presence in the home of the older child is essential to the *well-being* of the younger child (as distinguished from the necessaries to support life) and serves to strengthen family life, and thus may include his needs in the family budget. Although the need of the older child is met, it is not a "recipient" of benefits.

(Footnotes omitted.) *Cf. Constance v. Secretary of Health and Human Services,* 672 F.2d 990 (1st Cir. 1982). Thus, the "relative receiving aid" and the "essential person" represent two separate categories of persons whose needs may be included in the AFDC grant. Plaintiffs' nonneedy caretaker parents, if they were needy, would be "relative[s] receiving aid." They would never be essential persons.

3. That Congress intended to use the words "relative receiving aid" and "other individual ... whose needs are taken into account" as we suggest is underscored by subsection (a)(8)(D), for if these early sections were interpreted broadly to include the "nonneedy" caretaker, the language of this later section would still seem to place the "nonneedy" caretaker back outside the scope of the EID. It states that the agency shall not apply the EID to the income of

any of such persons specified in clause [(a)(8)(A)(ii)] if with respect to such month the income of the persons so specified (within the meaning of clause (a)) was in excess of their need as determined by the State agency pursuant to clause (7) (without regard to clause (8)), unless, for any one of the four months preceding

such month, the needs of such persons were met by the furnishing of aid under the plan.

By definition the income of the "nonneedy" caretaker was in "excess of" her "need," and thus the EID would not apply.

The district court, however, felt that subsection (a)(8)(D) applied to the family as a whole. That is, it interpreted "any of such persons specified in clause [ (a)(8)(A)(ii) ]" to refer to individuals, but it interpreted "the persons so specified" and "such persons" to refer, not to the "persons specified in clause [ (a)(8)(A)(ii) ]" but to the entire family. That is to say, unless the family qualified for AFDC without the EID, it would not receive it. While the district court correctly sees the primary purpose of this clause, its language does not easily bend to encompass the nonneedy caretaker. How can "persons" refer to the 'family' or the 'assistance unit'? It is specifically defined to exclude dependent children included under clause (a)(8)(A)(i), that is, a "dependent child receiving aid to families with dependent children who is . . . a full-time student or part-time student who is not a full-time employee attending a school, college, or university, or a course of vocational or technical training designed to fit him for gainful employment. . . ." All this simply illustrates the linguistic acrobatics in which one must engage to force the "nonneedy caretaker" into the language of these provisions. And, it illustrates why we are required to enforce the statute that Congress actually wrote, not the one we believe it ought to have written.

4. We are also reluctant to accept the plaintiffs' interpretation of the statute in light of the fact that the Department of Health and Human Services, the agency charged with enforcing the statute, and the state agencies which administer the programs have overwhelmingly rejected it. The Secretary of Health and Human Services has focused on the problem at issue here and has concluded that the language of the statute will not support the inclusion of nonneedy caretaker parents. *See* Letter of June 1981 from J. P. Mirabella to W. T.

Hogan. Thirty-nine of forty-one state agencies responding to a law review survey reached the same conclusion. Note, *AFDC Work-Incentive Anomaly,* 65 Cornell L.Rev. 934, 935 n. 9 (1980).

We must respect Health and Human Services' interpretation of its own governing statute—assuming such to be Congress's intent where the legal issue is minor, interstitial, and imbued with administrative history and complexity. *Social Security Board v. Nierotko,* 327 U.S. 358, 368–69, 66 S.Ct. 637, 642–643, 90 L.Ed. 718 (1946); *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *Constance v. Secretary of Health and Human Services,* 672 F.2d at 995. The Secretary's interpretation (and that of the majority of the state agencies) is consistent with longstanding administrative practice and congressional use of the relevant terms. The statute is highly technical. Congress gave no explicit indication of its views on this problem. Under these circumstances, to give weight to the agencies' interpretation of the statute promotes its coherent and consistent administration; to hold to the contrary would risk disruption, not only here but elsewhere in the program where similar words are used in other rules and regulations. The existence of good policy reasons for extending the EID to the income of nonneedy caretakers does not provide a "compelling indication" that the agencies' interpretation of the statute is wrong. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969). *See also Schweiker v. Hogan,* —— U.S. ——, ——, 102 S.Ct. 2597, 2608, 73 L.Ed.2d 227 (1982).

### III

The sole remaining question is whether the amendment of the Social Security Act in July 1981, Omnibus Budget and Reconciliation Act of 1981, Pub.L. No. 97–35, 95 Stat. 842, requires a different result. Congress reenacted the subsections at issue here without significant change in their language. While Congress changed surrounding sections, we do not believe those changes showed an intent to change the law here.

To be more specific, in 1981 Congress changed two other "disregards." It sought to standardize a "disregard" for work-related expenses and to cap another "disregard" for child-care expenses. It also reversed Health and Human Services' policy of calculating grant amounts by first subtracting the EID and then deducting work expenses. It did this technically by removing the language allowing the agency to disregard work and child-care expenses from the "income and resources clause" of subsection (a)(7) and writing new explicit clauses in subsection (a)(8), namely subsections (a)(8)(A)(ii) and (iii) respectively. The EID of "$30 plus one-third" reappears, in substantially unchanged language in (a)(8)(A)(iv). The exclusion—restricting the EID to grant calculations—also appears in substantially unchanged form in subsection (a)(8)(B)(ii)(I). Finally, Congress created a new subsection (a)(8)(B)(ii)(II), which drastically restricts use of the EID by providing that no one can receive it for more than four consecutive months.

Plaintiffs can point to the language Congress used when rewriting the work-expense and child-care "disregards." It stated they should be applied to the earned income of "any relative *applying for or receiving* aid." The agencies have interpreted *this* language as including nonneedy caretakers. Massachusetts does apply the work-expense and child-care "disregards" to the income of the nonneedy caretaker, 106 C.M.R. § 340.270, and Health and Human Services appears to do so. 45 C.F.R. § 233.20(a)(11)(B). If the words "relative ... applying for or receiving aid" include the nonneedy, why, plaintiffs ask, do the nearby words "relative receiving aid" not also do so? Has not Congress, at the least, introduced an ambiguity into the statute?

We believe there are four responses to these questions. First, the language uses the words "applying for" as well as "receiving." The interpretation of the phrase "applying for" so as to include persons applying for AFDC in behalf of other persons has some historical precedent. The phrase "applying for and receiving" appeared in a 1974 amendment to the Social Security Act which required that the state AFDC plan

(25) provide (A) that, as a condition of eligibility under the plan, each applicant for or recipient of aid shall furnish to the State his social security number ...;

(26) provide that, as a condition of eligibility for aid, each applicant or recipient will be required—

(a) to assign to the State any rights to support from any other person such applicant may have (i) in his own behalf or in behalf of any other family member for whom the applicant is applying for or receiving aid....

42 U.S.C. § 602(a)(25)(26), *as added by* Social Services Amendments of 1974, Pub.L. No. 93–647, 88 Stat. 2339 (1975). It is clear from these subsections that an "applicant" can be someone who applies on behalf of another. Thus, Congress in 1981 may have reverted to the designation of the 1974 Congress when drafting subsections (a)(8)(A)(ii) and (iii).

Second, that interpretation of "applying for and receiving" as including the child's deemed income earned by a nonneedy caretaker preserves the pattern of application of the work-expenses disregard prior to 1981. From the time of its introduction in 1962, the qualification of the income and resources clause that directed the states to consider "any expenses reasonably attributable to the earning of such income" has been applied to any earned income considered under subsection (a)(7), not merely the earned income of particular persons. There is no indication that Congress intended to alter this practice in 1981.

Third, Congress did not significantly change the language relevant here, the current versions of the 1968 Act's subsections (a)(8)(A)(ii) and (a)(8)(D). We must respect the intent of the Congress that enacted this language. *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. at 596, 100 S.Ct. at 813; *Teamsters v. United States,* 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977); *United States v. Merriam,* 263 U.S. at 187, 44 S.Ct. at 71; *Alabama v. TVA,* 636 F.2d at 1065. The 1981

Congress said nothing when it changed other sections that could lead one to believe that it intended to change the sections here at issue as well.

Fourth, we must continue to respect the interpretation of these sections by the Secretary of Health and Human Services. It is Health and Human Services' position that the 1981 Act did not reflect a change in the group of persons to whom the EID applies. *See* 45 C.F.R. § 233.20(a)(11)(i) and (ii); Letter dated February 16, 1982, from L.S. McMahon to T.H. Spirito (the above cited regulations "affirm the Department's longstanding position that the disregard does not apply to the earnings of the caretaker parent who is not included in the assistance unit.").

In sum, the statutory provision is a minor interstitial part of a longstanding program. Its language has a history. The agency has interpreted its complex language consistently. It warns us that its terms, in context, will not bear plaintiffs' interpretations. Our research confirms that the agency is correct. The legislative history is silent on the specific issue. The purpose of the provision supports, but does not compel the inclusion of plaintiffs' relatives. Under these circumstances we conclude that the agency is correct in its interpretation and the judgment of the district court is

*Reversed.*

## STATUTORY APPENDIX

### *1968 Statute*

42 U.S.C. § 602(a)(7), (a)(8) (1968)

§ 602. State plans for aid and services to needy families with children; contents; approval by Secretary

(a) A State plan for aid and services to needy families with children must ... (7) except as may be otherwise provided in clause (8), provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid, as well as any expenses reasonably attributable to the earning of any such income; (8) provided that, in making the determination under clause (7), the State agency—

(A) shall with respect to any month disregard—

(i) all of the earned income of each dependent child receiving aid to families with dependent children who is (as determined by the State in accordance with standards prescribed by the Secretary) a full-time student or part-time student who is not a full-time employee attending a school, college, or university, or a course of vocational or technical training designed to fit him for gainful employment, and

(ii) in the case of earned income of a dependent child not included under clause (i), a relative receiving such aid, and any other individual (living in the same home as such relative and child) whose needs are taken into account in making such determination, the first $30 of the total of such earned income for such month plus one-third of the remainder of such income for such month (except that the provisions of this clause (ii) shall not apply to earned income derived from participation on a project maintained under the programs established by section 632(b)(2) and (3) of this title);

.     .     .     .     .

except that, with respect to any month, the State agency shall not disregard any earned income (other than income referred to in subparagraph (b)) of—

.     .     .     .     .

(D) any of such persons specified in clause (ii) of subparagraph (A) if with respect to such month the income of the persons so specified (within the meaning of clause (7)) was in excess of their need as determined by the State agency pursuant to clause (7) (without regard to clause (8)), unless, for any one of the four

months preceding such month, the needs of such persons were met by the furnishing of aid under the plan;

\* \* \* \* \* \*

### 1981 Statute
### 42 U.S.C. § 602(a)(7), (a)(8) (1981)

§ 602. State plans for aid and services to needy families with children; contents; approval by Secretary

(a) A State plan for aid and services to needy families with children must . . .

(7) except as may be otherwise provided in paragraph (8) or (31) and section 615 of this title, provide that the State agency—

(A) shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid;

(B) shall determine ineligible for aid any family the combined value of whose resources (reduced by any obligations or debts with respect to such resources) exceeds $1,000 or such lower amount as the State may determine, but not including as a resource for purposes of this subparagraph a home owned and occupied by such child, relative, or other individual and so much of the family member's ownership interest in one automobile as does not exceed such amount as the Secretary may prescribe; and

(C) may, in the case of a family claiming or receiving aid under this part for any month, take into consideration as income (to the extent the State determines appropriate, as specified in such plan, and notwithstanding any other provision of law)—

(i) an amount not to exceed the value of the family's monthly allotment of food stamp coupons, to the extent such value duplicates the amount for food included in the maximum amount that would be payable under the State plan to a family of the same composition with no other income; and

(ii) an amount not to exceed the value of any rent or housing subsidy provided to such family, to the extent such value duplicates the amount for housing included in the maximum amount that would be payable under the State plan to a family of the same composition with no other income;

(8)(A) provide that, with respect to any month, in making the determination under paragraph (7), the State agency—

(i) shall disregard all of the earned income of each dependent child receiving aid to families with dependent children who is (as determined by the State in accordance with standards prescribed by the Secretary) a full-time student or a part-time student who is not a full-time employee attending a school, college, or university, or a course of vocational or technical training designed to fit him for gainful employment;

(ii) shall disregard from the earned income of any child or relative applying for or receiving aid to families with dependent children, or of any other individual (living in the same home as such relative and child) whose needs are taken into account in making such determination, the first $75 of the total of such earned income for such month (or such lesser amount as the Secretary may prescribe in the case an individual not engaged in full-time employment or not employed throughout the month);

(iii) shall disregard from the earned income of any child, relative, or other individual specified in clause (ii), an amount equal to expenditures for care in such month for a dependent child, or an incapacitated individual living in the same home as the dependent child, receiving aid to families with dependent children and requiring such care for

such month, to the extent that such amount (for each such dependent child or incapacitated individual) does not exceed $160 (or such lesser amount as the Secretary may prescribe in the case of an individual not engaged in full-time employment or not employed throughout the month); and

(iv) shall disregard from the earned income of any child or relative receiving aid to families with dependent children, or of any other individual (living in the same home as such relative and child) whose needs are taken into account in making such determination, an amount equal to the first $30 of the total of such earned income not already disregarded under the preceding provisions of this paragraph plus one-third of the remainder thereof (but excluding, for purposes of this subparagraph, earned income derived from participation on a project maintained under the programs established by section 632(b)(2) and (3) of this title); and

(B) provide that (with respect to any month) the State agency—

.        .        .        .        .

(ii)(I) shall not disregard, under subparagraph (A)(iv), any earned income of any of the persons specified in subparagraph (A)(ii), if, with respect to such month, the income of the persons so specified was in excess of their need, as determined by the State agency pursuant to paragraph (7) (without regard to subparagraph (A)(iv) of this paragraph), unless the persons received aid under the plan in one or more of the four months preceding such month and subparagraph (A)(iv) has not already been applied to their income for four consecutive months while they were receiving aid under the plan; and

(II) in the case of the earned income of a person with respect to whom subparagraph (A)(iv) has been applied for four consecutive months, shall not apply the provisions of subparagraph (A)(iv) for so long as he continues to receive aid under the plan and shall not

apply such provisions to any month thereafter until the expiration of an additional period of twelve consecutive months during which he is not a recipient of such aid;