915 F.2d 1372
 Regina VIERRA, Plaintiff-Appellant,
v.
Winona E. RUBIN, Esq., Director, Department of Human
Services, State of Hawaii,
Defendant-Third-Party-Plaintiff-Appellee,
v.
Louis W. SULLIVAN, M.D., Secretary of Health and Human
Services, Third-Party-Defendant-Appellee.
 No. 89-15459.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 13, 1990.
Decided Oct. 3, 1990.
 
 Charles H. Hite, Legal Aid Soc. of Hawaii, Honolulu, Hawaii, for plaintiff-appellant.
 Thomas D. Farrell, Deputy Atty. Gen., State of Hawaii, Honolulu, Hawaii, for defendant-third-party-plaintiffCharles P. Gillet, Asst. Regional Counsel, San Francisco, Cal., for third-party-defendant-appellee, Louis W. Sullivan, Secretary of Health and Human Services.
 Appeal from the United States District Court for the District of Hawaii.
 Before FARRIS, PREGERSON and RYMER, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 Regina Vierra received benefits under the Aid to Families with Dependent Children (AFDC) program. Because of circumstances beyond her control, she filed a required form one business day late. The State of Hawaii, which administers this cooperative federal-state program through its Department of Social Services, disqualified Vierra from one month's benefits because of the one day delay. The district court granted summary judgment upholding the denial of benefits. Vierra appeals. We reverse and grant summary judgment for Vierra.
 
 BACKGROUND
 1. Facts
 
 2
 Appellant Regina Vierra never finished high school, and does not read well. She has one child. In August 1979, Vierra and her child started receiving AFDC benefits. Until September 1987, this was her sole source of income.
 
 
 3
 In September 1987, Vierra began part-time work under Hawaii's Department of Social Services (the Department) Work Incentive ("WIN") Program. She promptly reported the employment on a Change in Status Form and on her first Monthly Eligibility Report Form ("MERF") filed after she began part-time work. Before starting her part-time job, Vierra had from time to time submitted late MERF forms without incident or penalty.
 
 
 4
 After Vierra notified the Department of her part-time work, the Department failed to instruct her on how to fill out a MERF form when part-time employment was involved. Even after learning of Vierra's employment, her caseworker never instructed Vierra on how to verify what she had been paid, nor on the need to submit pay verification information. The only instructions Vierra ever received were the standard instructions contained on the MERF form itself:
 
 
 5
 If this form is late, is incomplete, or is not returned, your check, food stamps, and medical benefits may be delayed or stopped. In addition, no earned income deductions will be allowed in determining the amount of your welfare check.... Attach pay stubs and verification of changes.
 
 
 6
 Vierra received her first pay checks in October 1987. A friend told her that paystubs had to be attached to her MERF form if Vierra wanted to maintain her AFDC benefits. Vierra was not informed, either by her friend, her caseworker, or the MERF form instructions, that pay verification could be made by any means other than pay stubs.
 
 
 7
 Under the regulations, Vierra was first required to attach pay verification to her MERF form on November 6, 1987. To file what she considered to be a complete form, Vierra repeatedly requested pay stubs from her employer (the employer did not attach stubs to her paychecks). Her employer did not produce the stubs, even after eight requests. Afraid that she would not be able to meet her November 6 deadline, Vierra unsuccessfully attempted to contact her caseworker. The caseworker did not return Vierra's call.
 
 
 8
 On November 9, a Monday, one business day after her MERF filing deadline, Vierra received paystubs from her employer and immediately filed them with her MERF form. The Department determined that Vierra should be denied the Earned Income Disregards (EIDs) necessary to bring her income within prescribed AFDC limits for that month because the filing was late, and because the Department believed information provided by the employer on the paystubs was incomplete and confusing. With the EIDs, Vierra would have received $198.00 in AFDC benefits. Without the EIDs, she received no AFDC benefits because her earned income amounted to $420.00 for the month of November, $12.00 over her standard need.
 
 
 9
 The Department informed Vierra, in an adverse action notice sent November 17, 1987, that excess countable income disqualified her for all AFDC benefits in December 1987. Vierra responded by immediately filing a fair hearing request. In a hearing held on January 21, 1988, the fair hearing officer affirmed the Department's decision. Though the officer regretted the "egregious" actions of Vierra's employer, she held that employer caused delay did not fall within the Hawaii Department of Social Services' definition of the "good cause" exception to filing requirements.
 
 
 10
 Vierra took her case to a Hawaii state court. Before any action was taken on the appeal, Hawaii's Department of Social Services filed a Third Party Complaint against the United States Department of Health and Human Services. The Secretary of Health and Human Services (the Secretary) removed the entire matter to the United States District Court.
 
 
 11
 The district court affirmed the Department's action on the grounds that (1) Hawaii's restrictive definition of "good cause" to excuse late MERF filings did not defeat general AFDC purposes, and (2) the Secretary's tacit approval of Hawaii's narrow "good cause" definition was entitled to deference.
 
 
 12
 2. "WIN" Programs, EIDs, and the "Good Cause" System
 
 
 13
 "The AFDC program is a cooperative federal-state effort established by Congress to provide financial assistance and other services to needy dependent children and parents or relatives with whom they live." Figueroa v. Sunn, 884 F.2d 1290, 1291 (9th Cir.1989). One specific purpose of the program is to encourage adult members of families receiving AFDC benefits "to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection." Id. (quoting 42 U.S.C.A. Sec. 601 (1983)). In recognition of the fact that the AFDC system can create a financial incentive not to work, Congress enacted Earned Income Disregard (EID) provisions. Drysdale v. Spirito, 689 F.2d 252, 254 (1st Cir.1982). "By 'disregarding' certain classes of income that would otherwise be counted in the [AFDC] eligibility and benefits determinations, more families are deemed eligible for assistance than would otherwise be the case, and their benefits are increased." Simpson v. Hegstrom, 873 F.2d 1294, 1295 (9th Cir.1989).
 
 
 14
 Earned Income Disregards are central to the effective operation of work incentive or "WIN" programs run by states pursuant to 42 U.S.C.A. Sec. 645(b)(1)(B) (1983). Without these disregards, "increased income reduces the size of the AFDC grant, [and] members of AFDC families may have little financial incentive to work." Drysdale v. Spirito, 689 F.2d at 254. The Secretary of Health and Human Services has promulgated regulations requiring state agencies to follow particular guidelines in defining earned income for purposes of the disregard. See Figueroa v. Sunn, 884 F.2d at 1291 (giving examples of earned income excluded by the disregards).
 
 
 15
 In 1980, Congress enacted legislation requiring timely eligibility reports as a means for ensuring correct eligibility determinations and benefit levels. 42 U.S.C.A. Sec. 602(a)(8)(B)(i)(III) (West Supp.1989). It did so in response to concerns that "a large percentage of the payment errors made in the AFDC program relate to earned income and the failure of the recipient to report the correct amount of any changes in amount earned." S.Rep. No. 336, 96th Cong., 2d Sess., reprinted in 1980 U.S.Code Cong. & Admin.News 1448, 1538. Earned income disregards are required to be withheld from tardy filers except those who show good cause.[1]
 
 
 16
 The Secretary has promulgated a regulation allowing the State to specify the nature of "good cause" in the context of late filing. 45 C.F.R. Sec. 233.20(a)(11)(iii)(C) (1988). Pursuant to this regulation, Hawaii's Department of Social Services promulgated a restrictive definition of good cause which recognizes only two exceptions from late filing penalties: "Good cause exists when there is verification [that] ... [a]n illness prevented the recipient from ... submitting a completed Monthly Eligibility Report on a timely basis; or ... [t]he recipient has experienced a problem in mailing which the recipient could not prevent." H.A.R. Sec. 17-621-40(d)(3).
 
 DISCUSSION
 
 17
 This court reviews a grant of summary judgment de novo, affirming the district court's grant only where no genuine issue of material fact exists and the moving party is entitled to prevail as a matter of law. Figueroa v. Sunn, 884 F.2d at 1292. The facts, including the fact that Vierra's MERF form was filed late because of circumstances beyond her control, are undisputed by the parties. We must therefore determine whether the state defendant and the third party federal defendant are entitled to prevail as a matter of law.
 
 
 18
 A court may invalidate an agency regulation if it "is not reasonably related to the purposes of the statute it seeks to implement," id. at 1293, or if legislative history reveals a clear expression of congressional intent that runs contrary to the regulation. Connecticut Dept. of Income Maintenance v. Heckler, 471 U.S. 524, 538, 105 S.Ct. 2210, 2217, 85 L.Ed.2d 577 (1985).[2] This is so despite the deference generally afforded "an agency's construction of the statute it is charged with implementing, and ... the procedures it adopts for implementing that statute." Simpson v. Hegstrom, 873 F.2d at 1297 (quoting Heckler v. Chaney, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985)).
 
 
 19
 To decide what deference is due to the Hawaii Department of Social Services' good cause regulation, we review three distinct agency determinations. First, there is the question whether the Secretary misinterpreted Congressional intent when he promulgated the regulation authorizing states to define "good cause" for purposes of late MERF form filings. Second, there is the question whether the Secretary acted unreasonably when he tacitly approved Hawaii's good cause definition. Third, there is the question whether the state agency, the Hawaii Department of Social Services, misinterpreted federal legislation and agency regulations in promulgating the state's regulation.
 
 
 20
 To decide what deference is due the good cause definition at issue in this case, we separately discuss each agency determination listed above.
 
 
 21
 1. Federal Regulation Delegating Good Cause Definitions to the States
 
 
 22
 It is not clear from the statutory language that Congress intended to leave the definition of good cause for late MERF form filings to the states. Indeed, the plain language of the section indicates that Congress meant to leave to the states the determination of "timely report," but not of "good cause."
 
 
 23
 The statute relied upon by the Secretary for delegating the definition of good cause to the states reads as follows: "the State Agency ... shall not disregard ... any earned income of [designated persons who] failed without good cause to make a timely report (as prescribed by the State plan pursuant to paragraph (14))." 42 U.S.C. Sec. 602(a)(8)(B)(i)(III) (emphasis added). As pointed out by the appellant, the parenthetical phrase "as prescribed by the State plan" modifies "timely report," not "good cause."
 
 
 24
 The regulation promulgated by the Secretary to implement this section, 45 C.F.R. Sec. 233.20(a)(11)(iii)(C) (1989), does not track the language in the statute drafted by Congress. Indeed, the Secretary's regulation reverses the responsibility described in the statute for determining "good cause" (which the regulation assigns to the States) and of "timely reports" (which the regulation defines by another federal regulation). The Secretary's regulation reads: "[t]he applicable earned income disregards ... of this paragraph do not apply to [an individual's earned income] ... in which ... [a]n individual failed without good cause (as specified in the State plan) to make a timely report (as defined in Sec. 233.37(c))."
 
 
 25
 "[Q]ualifying phrases are generally applied to the immediately preceding phrase and not to phrases more remote." First Charter Fin. Corp. v. United States, 669 F.2d 1342, 1350 (9th Cir.1982). A reading of the section which logically associates "as prescribed by the State plan" to the timeliness of the report and not to good cause is a natural reading which relies on the grammatical structure of the statute. A reading of a statute which relies on grammatical structure is an approach often used by the courts. See e.g., United States v. Ron Pair Enter., 489 U.S. 235, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989) ("This reading is also mandated by the grammatical structure of the statute."); Tello v. McMahon, 677 F.Supp. 1436, 1443 (E.D.Cal., 1988) (ruling that "Congress left the determination of timeliness [in section 602(a)(8)(B)(i)(III) ] to the states" based on the position of parenthetical clarification).
 
 
 26
 As further support for this argument, paragraph (14) referred to in the parenthetical deals specifically with timeliness issues, not good cause questions. See 42 U.S.C.A. Sec. 602(a)(14) (West Supp.1990).[3]
 
 
 27
 We do not, therefore, believe that the plain language of the statute required the Secretary to delegate responsibility for defining "good cause" for untimely MERF form filings to the states. The next question is whether Congress permitted the Secretary to delegate the responsibility for defining good cause to the states even though the statute does not require such delegation.
 
 
 28
 "In the absence of a statutory definition [of a term] ... it is appropriate to consider the Secretary's interpretation of that term." Connecticut Dept. of Income Maintenance v. Heckler, 471 U.S. at 530, 105 S.Ct. at 2214 (footnote omitted). In this case, however, the Secretary did not define "good cause" for the purpose of late MERF form filings, but instead delegated that decision to the states. Such a delegation is not impermissible per se. In the context of other AFDC disputes, we have held that "[a] conspicuous lack of guidance by Congress ... confirms breadth of discretion granted to states." Largo v. Sunn, 835 F.2d 205, 208 (9th Cir.1987).
 
 
 29
 Nevertheless, when the Secretary delegates to a state's discretion the definition of an important statutory term, the states' authority to define the term can not exceed the authority given the Secretary by Congress in the first place. Congress has expressly described the Secretary's authority in the context of the AFDC program. The Secretary is authorized to "make and publish such rules and regulations, not inconsistent with [the AFDC program], as may be necessary to the efficient administration of the functions with which [he] is charged under [the AFDC program]." 42 U.S.C.A. Sec. 1302(a) (West Supp.1990). The Secretary may thus delegate definitional responsibilities to the states only to the extent that the state's determinations are also consistent with the AFDC program generally. See United States v. Larionoff, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977) ("regulations, in order to be valid must be consistent with the statute under which they are promulgated") (footnote omitted). In this case, appellant argues, and we agree, that Hawaii's definition of good cause for the purposes of untimely MERF form filing is not consistent with the AFDC program. The Secretary's delegation to Hawaii of the good cause definition is invalid to the extent that it allows Hawaii to exceed the scope of the Secretary's initial authority to formulate the definition. Hawaii exceeded the scope of this authority in two specific ways when it restrictively defined good cause.
 
 
 30
 First, the Hawaii good cause definition is not consistent with the legislative purposes of the AFDC program, "WIN" work incentive programs, or MERF form filing deadlines. The goal of the AFDC program is to help AFDC families "attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection." Figueroa v. Sunn, 884 F.2d at 1291 (quoting 42 U.S.C. Sec. 601 (1982)). Earned income disregards provided by the WIN work incentive programs provide an "affirmative incentive to employment" by allowing working AFDC recipients to enjoy more fully the fruits of their employment. Heckler v. Turner, 470 U.S. 184, 191, 105 S.Ct. 1138, 1142, 84 L.Ed.2d 138 (1985). And while Congress enacted penalties for late MERF form filers out of a concern that late filing contributed to erroneous welfare payments, Congress expressly included the good cause exemption to provide a shield for innocent late filers. See H.R.Conf.Rep. No. 900, 96th Cong., 2d Sess., reprinted in 1980 U.S.Code Cong. & Admin.News 1584.[4]
 
 
 31
 Hawaii's restrictive good cause definition thus undercuts Congress's broad vision in the AFDC program of fostering self-sufficiency and personal independence. Hawaii's restrictive good cause definition also conflicts with the Congressional mandate of providing an affirmative incentive to employment.
 
 
 32
 Second, the restrictive Hawaii good cause definition is inconsistent with the regulatory scheme developed by the Secretary to implement the AFDC program. Regulations promulgated by the Secretary specifically require states to "provide recipients an opportunity to show good cause for not filing a timely report of earnings." 45 C.F.R. Sec. 233.37(c) (1988). Hawaii's restrictive definition of good cause can work to deprive the applicant of any realistic opportunity to present her case for good cause as required by the regulation.
 
 
 33
 The Hawaii good cause definition also conflicts with federal regulations which provide that eligibility conditions may not be imposed arbitrarily or unreasonably. 45 C.F.R. Sec. 233.10(a)(1) (1988).[5] Federal regulations stress that "eligibility conditions must be applied on a consistent and eq uitable basis throughout the State." 45 C.F.R. Sec. 233.10(a)(1)(iv) (1988) (emphasis added).[6]
 
 
 34
 Case law has "erected a fundamental principle of AFDC jurisprudence: that the Social Security Act will not countenance the depriving of needy children benefits because of factors beyond their control and unrelated to need." Simpson v. Miller, 535 F.Supp. 1041, 1050 (N.D.Ill.1982) (citing King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968)). Hawaii's restrictive good cause definition is unreasonable and results in inequitable treatment of employed AFDC recipients who have legitimate, good cause reasons for submitting late MERF form filings (in Vierra's case, a late filing due to circumstances beyond her control). The state agency's good cause definition is thus inconsistent with the federal regulatory scheme, as well as federal legislative intent.
 
 
 35
 The Secretary's decision to delegate the definition of good cause for late MERF form filings is invalid to the extent that it allows the state to promulgate a rule inconsistent with federal legislative intent and regulations. We will not "rubberstamp ... administrative decisions that [are] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting NLRB v. Brown, 380 U.S. 278, 291-92, 85 S.Ct. 980, 988-89, 13 L.Ed.2d 839 (1965)).
 
 
 36
 2. The Secretary's "Approval" of the Good Cause Definition
 
 
 37
 In order for a state to receive federal funds under the AFDC program, the state must submit to the Secretary, and have the Secretary approve, "a plan for aid and services that complies with the requirements set forth by the AFDC legislation." Figueroa v. Sunn, 884 F.2d at 1291. Because the Secretary approved Hawaii's general AFDC plan, including the section defining good cause, the government argues that we should defer to this approval as part of our general deference to agency determinations and expertise.
 
 
 38
 We will not, however, defer to the Secretary's tacit approval or interpretation of a regulation which is plainly erroneous or inconsistent with statutory and regulatory mandates. Simpson v. Hegstrom, 873 F.2d at 1297. For the reasons stated above, Hawaii's good cause definition is inconsistent both with the AFDC legislation and with regulations promulgated by the Secretary to implement those provisions. The Secretary plainly erred in its approval of the Hawaii state plan to the extent that he approved Hawaii's good cause definition in the context of untimely MERF form filing. We need not defer to this error.
 
 
 39
 3. Deference Due the State's Exercise of Discretion
 
 
 40
 Because of the breadth of discretion generally granted to the states in the administration of the AFDC program, see Largo v. Sunn, 835 F.2d at 208, appellees argue that we should defer to Hawaii's good cause definition as a legitimate policy choice which furthers the specific Congressional purpose behind the earnings penalty sanction of Sec. 602(a)(8)(B)(i)(III). We have already explained how Hawaii erred when it formulated an overly restrictive good cause definition. Nevertheless, the deference due a state's policy determination is an issue distinct from those addressed above.
 
 
 41
 The state appellee characterizes Vierra's loss of subsistence level benefits as the case of "a woman who tried to claim a reward too late." The state then argues that this court is not free to craft its own regulation based upon judicial notions of what constitutes a "better" policy. The federal appellee agrees, as apparently did the district court, that Hawaii's restrictive definition of good cause is a legitimate policy choice which we should not disturb.
 
 
 42
 The position that Hawaii's good cause definition constitutes a legitimate state policy choice fails to consider the consistency and reasonableness of the state regulation in relation to the AFDC purpose of equitability in benefit determinations, and in relation to federal regulations which have been promulgated to implement that purpose. See 45 C.F.R. Secs. 233.10(a)(1), 233.10(a)(1)(iv), and 233.20(a)(1)(i). As pointed out above, the state may not promulgate AFDC regulations which are inconsistent with federal statutory and regulatory schemes.
 
 
 43
 The governments' position also fails to address the proper role of judicial review of agency determinations. Under the Administrative Procedure Act, we are required to review agency policy for consistency with and reasonableness under the agency's legislative mandate. 5 U.S.C. Sec. 706(2)(C) (1977).[7]
 
 
 44
 Vierra does not request that we formulate our own version of what "good cause" should be in this context. She urges us to invalidate the state regulation which contradicts federal legislative policy choices and federal regulations which seek to implement that policy. The Hawaii good cause definition is the result of a series of unreasonable interpretations of the Congressional mandate to determine AFDC eligibility in an equitable and reasonable fashion, and is inconsistent with the federal regulatory scheme which implements the AFDC program. Thus no deference is due Hawaii's good cause definition as a policy choice. We therefore grant Vierra's request to invalidate the Hawaii good cause definition.
 
 CONCLUSION
 
 45
 We find that the Hawaii Department of Social Services definition of good cause in H.A.R. section 17-621-40(d)(3) is invalid due to its inconsistency with federal statutory commands and federal regulations. The district court's order granting summary judgment for the government is therefore REVERSED. Vierra's summary judgment motion is hereby GRANTED.
 
 RYMER, Circuit Judge, dissenting:
 
 46
 The issue in this case is one of statutory interpretation. It arises in the context of cooperative federalism. Specifically, we are asked to determine how the words "good cause" contained in 42 U.S.C. Sec. 602(a)(8)(B)(i)(III) are to be defined, and if the states are allowed to define this term, whether Hawaii's definition of "good cause" is overly restrictive and thus in direct contravention of federal welfare policies.
 
 
 47
 Section 602(a)(8)(B)(i)(III) reads in part:
 
 
 48
 A State plan for aid and services to needy families with children must ... provide that, with respect to any month, in making the determination [of need], the State agency ... shall not disregard ... any earned income of any one of the persons specified [as eligible] if such person ... failed without good cause to make a timely report (as prescribed by the State plan pursuant to paragraph (14) to the State agency of earned income received in such month....)
 
 
 49
 42 U.S.C. Sec. 602(a)(8)(B)(i)(III) (emphasis added). Neither the statute not its legislative history define the words "good cause."
 
 The regulations to the statute state:
 
 50
 The applicable earned income disregards[1] ... do not apply to the earned income of the individual for the month in which one of the following conditions apply to him:
 
 
 51
 (C) An individual failed without good cause (as specified in the State plan) to make a timely report (as defined in Sec. 233.37(c)) of that income.
 
 
 52
 45 C.F.R. Sec. 233.20(a)(11)(iii)(C) (emphasis added). The regulations, thus, permit the states to promulgate individual definitions of "good cause."
 
 
 53
 Hawaii's definition of good cause is narrow, encompassing only two specific situations: 1) where an illness prevents the recipient from submitting a timely Monthly Eligibility Report Form (MERF),[2] and 2) where a mailing problem outside the recipient's control caused the filing delay. Haw.Admin.Rules Secs. 17-621-40(d)(3)(A) & (B). The Department of Health and Human Services approved Hawaii's definition. Since Vierra's failure properly and timely to file her November MERF did not fall into either one of the categories specified in the Hawaii rule, the Department of Human Services denied her AFDC benefits for the month of December.
 
 
 54
 Vierra first argues that "[n]either the plain language nor legislative history of the 'good cause' provision in 42 U.S.C. section 602(a)(8)(B)(i)(III) evidenced any congressional intent to authorize state restrictions on good cause."
 
 
 55
 Section Sec. 602(a)(8)(B)(i)(III) was Congress' response to the concern that AFDC recipients were not reporting their income on a timely basis, resulting in substantial errors and overpayments.
 
 
 56
 Quality Control reviews show that a large percentage of the payment errors made in the AFDC program relate to earned income and the failure of the recipient to report the correct amount of any changes in amount earned.
 
 
 57
 Senate Report 96-336, 96th Congress, 2d. Sess., reprinted in 1980 U.S.Code, Cong. & Ad.News 1538. Prior to the statute's enactment, most states did not require income to be reported on a monthly basis. Further, when state agencies learned that a recipient had unreported earned income in prior months, "they [gave] him the benefit of all the earned income disregards provided in law in calculating the amount of the overpayment. Thus, if a recipient [was] negligent in reporting his earnings even over a long period of time, there [was] no penalty involved." Id. To eliminate the problems noted in the quality control reviews, Congress enacted Sec. 602(a)(8)(B)(i)(III), thereby instituting a timely monthly reporting requirement. That is the purpose behind the statute.
 
 
 58
 The "good cause" exception to this monthly reporting requirement is not defined in the statute or the legislative history. Consequently, we must "consider the Secretary's interpretation of that term." Connecticut Dept. of Income Maint. v. Heckler, 471 U.S. 524, 530, 105 S.Ct. 2210, 2213, 85 L.Ed.2d 577 (1985). The Act expressly provides the Secretary with the authority to publish "such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which each is charged under this chapter." 42 U.S.C. Sec. 1302. The Secretary published a regulation concerning how the words "good cause" were to be defined: regulation 45 C.F.R. Sec. 233.20(a)(11)(iii)(C) requires each state, with Department approval, to determine what constitutes good cause.
 
 
 59
 An agency's interpretation of a statute it is charged with administering is entitled to substantial deference. Simpson v. Hegstrom, 873 F.2d 1294, 1297 (9th Cir.1989). "[C]ourts will overturn an agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.' " Id. Our task is therefore a limited one. First, we must determine whether or not the Secretary's regulation is "manifestly contrary to the statute." Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Second, we must determine whether or not the regulation is arbitrary or capricious. Id.; Schweiker v. Gray Panthers, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); Atkins v. Rivera, 477 U.S. 154, 106 S.Ct. 2456, 2461, 91 L.Ed.2d 131 (1986).
 
 
 60
 The Secretary's delegation to the states to determine the specific contours of "good cause" is neither manifestly contrary to the statute, nor arbitrary or capricious. First, the AFDC program is a cooperative federal-state program designed to provide federal funds to states "once they establish a plan approved by the Secretary of HHS." Largo v. Sunn, 835 F.2d 205, 206 (9th Cir.1987). The nature of the statute contemplates broad state participation in formulating specific state programs. Therefore, given the Secretary's broad authority "to prescribe standards for applying certain sections of the Act," Schweiker v. Gray Panthers, 453 U.S. at 43, 101 S.Ct. at 2640, and a lack of guidance from Congress in defining a statutory term, it does not seem unreasonable, or contrary to the statute's structure, for the Secretary to require each state to define "good cause."[3] Further, as the district court held:
 
 
 61
 [t]his proposition [that the Secretary's deferral of authority to the states should be respected] is bolstered by the fact that Congress has been explicit elsewhere in the AFDC context when it has assigned only to the Secretary the responsibility for defining "good cause.".... Thus, where Congress has failed to be so explicit, approval of state "good cause" definitions is entirely acceptable as long as AFDC's fundamental purpose is not defeated thereby.
 
 
 62
 Order, p. 12, Case No. 88-00295 (January 23, 1989).
 
 
 63
 Because the Secretary reviewed and approved the Hawaii regulation, we must review the Hawaii regulation under the same deferential standard of review accorded the Secretary. The key to this review is that the Secretary cannot adopt a state's regulation that would defeat the fundamental purpose of the AFDC program. Batterton v. Francis, 432 U.S. 416, 428, 97 S.Ct. 2399, 2407, 53 L.Ed.2d 448 (1977). The district court held that Hawaii's regulation did not defeat the AFDC program's fundamental purpose. In fact, the Hawaii regulation furthers the specific congressional purpose behind the enactment of Sec. 602(a)(8)(B)(i)(III). The Hawaii regulation encourages the reporting of income on a timely basis, in order to avoid substantial errors and overpayments. As the district court stated, "the definition's rigidity arguably fosters overall efficiency in the State's administration and disbursement of AFDC benefits. Procedural requirements, although capable of producing harsh results at the perimeter, are necessary for the general streamlining of any benefits program." Order (January 23, 1989) at 14.
 
 
 64
 Vierra argues that Hawaii's narrow construction of good cause defeats the overall goal of the AFDC program which is to help AFDC families "obtain or retain capability for maximum self-support and personal independence." See 42 U.S.C. Sec. 601. This narrow regulation, Vierra argues, could result in more widespread withholding of the earned income disregards, and thus discourage more AFDC recipients from obtaining jobs. Although this argument has some merit, its weight should be discounted. First, submitting an untimely MERF does not disqualify the participant from the program. Rather, the participant loses benefits for one month. If a timely MERF is submitted in a subsequent month, benefits resume. Losing the earned income disregards for one month cannot be said fundamentally to defeat the purpose of the AFDC program.
 
 
 65
 Further, as the district court said, "alternatives are open to those persons caught in Vierra's dilemma, although apparently she failed to realize these options." Order (January 23, 1989) at 13. Someone else caught in Vierra's dilemma, therefore, would not necessarily suffer the same result.
 
 
 66
 Consequently, I respectfully dissent.
 
 
 
 [1]
 "[T]he State agency shall not disregard ... any earned income of [a recipient who] ... failed without good cause to make a timely report (as prescribed by the State plan pursuant to paragraph (14)) to the State agency of earned income received in such month." 42 U.S.C. Sec. 602(a)(8)(B)(i)(III) (emphasis added)
 
 
 [2]
 It is not uncommon for courts to invalidate state and federal agency regulations in the area of health and human services benefits. See, e.g., Citizens Action League v. Kizer, 887 F.2d 1003 (9th Cir.1989), cert. denied sub nom. Department of Health Services v. Citizens Action League, --- U.S. ----, 110 S.Ct. 1524, 108 L.Ed.2d 764 (1990) (reversing district court by ruling a California agency's interpretation of "estate" within provision of Medicaid law was impermissibly broad as inconsistent with federal regulations, despite the fact that the interpretation was supported by the Secretary); Briggs v. Sullivan, 886 F.2d 1132, 1139 (9th Cir.1989) (rejecting deference to agency expertise in context of administrative remedy exhaustion "where a claimant's interest in having a particular issue resolved promptly is so great that deference to the agency's judgment is inappropriate") (quoting Mathews v. Eldridge, 424 U.S. 319, 330, 96 S.Ct. 893, 900, 47 L.Ed.2d 18 (1976)); Figueroa v. Sunn, 884 F.2d 1290, 1292-93 (9th Cir.1989) (holding that the Hawaii Department of Social Services's characterization of temporary disability benefits as unearned income violated Social Security Act purposes); Simpson v. Hegstrom, 873 F.2d 1294 (9th Cir.1989) (affirming district court judgment that Secretary's interpretation of a regulation implementing AFDC "WIN" program was "unreasonable" and therefore invalid); Cervantes v. Sullivan, 719 F.Supp. 899 (E.D.Cal.1989), addendum at 724 F.Supp. 757 (E.D.Cal.1989) (invalidating Department of Health and Human Services regulation which counted garnished funds in determining supplemental security income as inconsistent with the statute)
 
 
 [3]
 In fact, language in paragraph 14 authorizes the states to "select categories of recipients who may report at specified less frequent intervals upon a determination that to require individuals in such categories to report monthly would result in unwarranted expenditures for administration of this paragraph." 42 U.S.C.A. Sec. 602(a)(14). This concern with unwarranted administrative expenditures would seem to run counter to the government's pursuit of Ms. Vierra in Federal Court for an alleged overpayment of $198.00
 
 
 [4]
 The House adopted the Senate's inclusion of the good cause exemption in the effort to reverse the problems related to late reporting. The Senate bill provided that "the earnings disregards would not be applied to any earned income that is not reported on a timely basis (unless there is good cause)." H.R.Conf.Rep. No. 900, 96th Congress, 2d Sess., reprinted in 1980 U.S.Code Cong. & Admin.News 1584
 
 
 [5]
 "The groups selected for inclusion in the plan and the eligibility conditions imposed must not exclude individuals or groups on any arbitrary or unreasonable basis, and must not result in inequitable treatment of individuals or groups in the light of the provisions and purposes of the public assistance titles of the Social Security Act." 45 C.F.R. Sec. 233.10(a)(1) (1988) (emphasis added)
 
 
 [6]
 The federal appellees argue that MERF filing requirements and good cause exemptions are factors independent of the general AFDC eligibility and benefit level determinations. Implied in such an argument is the notion that termination of benefits need not proceed in the same equitable and consistent manner as determination of eligibility in the first place, a notion plainly inconsistent with the requirements of due process as well as the Congressional mandate
 
 
 [7]
 "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. Sec. 706(2)(C)
 
 
 [1]
 The earned income disregards (EID) provision of the AFDC program
 flow from Congress' recognition that the AFDC system can create a financial incentive not to work.... The EID ... reflected Congress' awareness that because increased income reduces the size of the AFDC grant, members of AFDC families have little financial incentive to work.
 Simpson v. Hegstrom, 873 F.2d 1294, 1295 (9th Cir.1989) (quoting Drysdale v. Spirito, 689 F.2d 252, 254 (1st Cir.1982). To counter this "perverse incentive," the State disregards certain earned income of AFDC applicants. Id. EIDs effectively reward AFDC recipients who find jobs. For instance, the amount of assistance is usually the difference between income and need. Vierra's income exceeded her need. Consequently, under the usual formula she did not qualify for benefits. However, under the EID provisions, part of her income was disregarded for purposes of calculating her eligibility for assistance. As a result, she qualified for an AFDC payment of almost $200.
 
 
 [2]
 The MERF form requires disclosure of information relating to employment status and income. Each month a MERF is mailed to every AFDC recipient. The recipient has until the sixth working day of the following month to mail or deliver the MERF back to the caseworker. If the MERF is late, penalties are imposed
 
 
 [3]
 The language of the statute reads in part: "(III) failed without good cause to make a timely report (as prescribed by a State plan ...)...." 42 U.S.C. Sec. 602(a)(8)(B)(i)(III). Vierra argues that the parenthetical phrase was only intended to modify "timely report." Vierra is right in the sense that the plain language of the statute does not expressly give the states the authority to define "good cause." By the same token, the plain language of the statute doesn't give anyone the authority to define "good cause." Someone, somewhere, has to make that determination. Given the nature of the program and the statutory scheme, the Secretary's decision to delegate that responsibility to the states in the first instance is sensible